FILED
2006 NOV 21 PM 1: 20

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EXCEL INNOVATIONS, INC.,

    Plaintiff(s),

v.

INDIVOS CORPORATION, ET AL.,

    Defendant(s).

No. C-03-3125 MMC (JCS)

**REPORT AND RECOMMENDATION RE MOTION FOR SANCTIONS AGAINST EXCEL INNOVATIONS, INC. AND NED HOFFMAN [Docket No. 323]**



## I.    INTRODUCTION

Defendants, Indivos Corporation ("Indivos") and Solidus Networks, Inc. ("Solidus"), bring a Motion for Sanctions Against Excel Innovations, Inc. and Ned Hoffman ("the Motion"), requesting that the Court dismiss Excel's claims against them on the basis that Excel and Hoffman allegedly fabricated and concealed evidence and committed perjury. The Motion was referred to the undersigned magistrate judge for a report and recommendation. *See* Order Referring to Magistrate Judge Spero Defendants' Motion for Sanctions, filed October 23, 2006. A hearing on the Motion was held on Friday, October 27, 2006, at 9:30 a.m. For the reasons stated below, it is recommended that the Motion be GRANTED.

## II.    BACKGROUND

### A.    Procedural Background

Plaintiff Excel filed this action on July 7, 2003, and filed its First Amended Complaint on August 15, 2003. In the First Amended Complaint, Excel asserts fifteen patent infringement claims based on fifteen separate patents, as well as a claim for breach of contract against Defendants Indivos and Solidus. A key contention in the complaint is that a 1995 licensing agreement ("the 1995 IP-Patent License") between Excel (allegedly the original owner of the patents at issue) and a

predecessor of Indivos, SmartTouch LLC, was breached and, therefore, that all ownership rights over the disputed patents have reverted to Excel.

On November 6, 2003, Solidus and Indivos asserted counterclaims against Excel, former Excel CEO Ned Hoffman, and an entity formed by Hoffman in 2003, Aviv LLC ("Aviv"). In their counterclaims, Solidus and Indivos sought declaratory relief regarding ownership of the patents and asserted their own claims of patent infringement and inducement to infringe. In addition, Solidus and Indivos asserted claims for intentional interference with prospective business advantage, unfair advertising in violation of the Lanham Act, Business Disparagement/Slander of Title, and conspiracy to commit these alleged violations. According to Solidus and Indivos, the 1995 IP-Patent License was fabricated and in fact, full ownership of the disputed patents had been transferred by Excel's predecessor, Omnilock, to SmartTouch LLC when the latter entity was formed in return for shares in SmartTouch LLC.

On December 1, 2003, Excel filed an answer to Defendants' counterclaims and asserted counterclaims of its own.[1] These included a request for declaratory relief regarding ownership of the patents, as well as the following counterclaims: 1) breach of contract based on failure of consideration, on the theory that even if Omnilock agreed to convey its patent rights to SmartTouch LLC in return for stock shares, Excel was deprived of consideration under that agreement by Indivos' subsequent merger with Solidus, which is characterized as a "sham merger" intended to eliminate Excel as a shareholder; 2) breach of contract based on frustration of purpose, on the theory that to the extent Excel received any shares in return for transfer of ownership of the patents, those shares were rendered worthless because Indivos squandered its resources rather than using them to develop the technology in the patents; 3) breach of contract based on breach of fiduciary duty, on the same theory; 4) fraud, based on the theory that to the extent Indivos obtained any patent rights through its merger with Solidus, the merger was obtained through fraudulent misprepresentations to Indivos shareholders.

---

[1] On December 1, 2006, Hoffman and Aviv filed an answer to Indivos and Solidus' counterclaims but did not assert their own counterclaims.

1    On March 12, 2004, Excel filed a motion for partial summary judgment on the ownership of
2    the patents. Hoffman and Aviv joined in the motion on March 15, 2004. On April 2, 2004,
3    Defendants, in turn, filed a motion for partial summary judgment on the same issue. On May 4,
4    2004 – ten days prior to the scheduled hearing on the summary judgment motions – Defendants also
5    filed a motion for sanctions against Excel, Hoffman and Aviv based on the same alleged conduct as
6    is raised in this Motion. In an Order dated May 27, 2004 ("the May 27, 2004 Summary Judgment
7    Order"), the Court granted Defendants' summary judgment motion and denied Excel's summary
8    judgment motion, concluding that the patents belonged to Defendants. The Court acknowledged that
9    "Defendants vigorously challenge the authenticity of the May 8, 1995 IP-Patent License." May 27,
10   2004 Summary Judgment Order at 40. It did not reach that question, however, because it concluded
11   that under a subsequent operating agreement for SmartTouch LLC, dated June 16, 1995, Excel's
12   predecessor, Omnilock, gave SmartTouch LLC all of its patent rights in the disputed patents. *Id.* at
13   46. On that basis, Defendants were found, as a matter of law, to own the disputed patents.

14   On June 17, 2004, Excel, Hoffman and Aviv filed bankruptcy proceedings. As a result, this
15   action was automatically stayed pursuant to 11 U.S.C. § 362(a) and the sanctions motion was denied
16   without prejudice. *See* Docket No. 276. Hoffman's bankruptcy proceeding was dismissed
17   September 1, 2004 but Excel's proceeding continues to the present. *See* Request for Judicial Notice
18   in Support of Defendants' Motion for Sanctions Against Excel Innovations, Inc. and Ned Hoffman
19   ("Defendants' Request for Judicial Notice"), Ex. D.[2]

20   On October 20, 2004, Indivos and Solidus brought a motion in the bankruptcy proceeding
21   asking that the stay be lifted to allow this action to proceed. *See* Declaration of Scott Goodsell
22   ("Goodsell Decl."), Ex. A (October 20, 2004 Motion). The October 20, 2004 motion mentions the
23   sanctions motion but is not limited to resolution of that motion. *Id.* Rather, Defendants requested
24   that the stay be lifted in its entirety as to both this action and a separate arbitration between the

27   [2] Defendants request judicial notice of various orders and pleadings in this and other actions and
28   proceedings involving Excel and/or Defendants. These requests are granted pursuant to Federal Rule of Evidence 201 and on the basis that no objections have been raised by Plaintiff.

United States District Court
For the Northern District of California

1 parties.[3] *Id.* Hearings on the October 20, 2004 motion were held on January 5, 2005 and February
2 17, 2005. *Id.*, Ex. B (February 22, 2005 Notice of Withdrawal). Indivos and Solidus withdrew the
3 motion on February 22, 2005. *Id.* According to Plaintiff, the motion was withdrawn because the
4 bankruptcy judge made clear at the hearings that he was "likely to grant Defendants' motion only to
5 the limited extent of allowing Excel to seek a Rule 54(b) certification from the district court in order
6 to appeal from the summary judgment on the issue of ownership of the patents in dispute in the
7 Patent Case." *Id.*, ¶ 4. At that point, Excel filed its own motion seeking relief from the stay as to the
8 summary judgment motion only. *Id.*, ¶ 5 & Ex. C (February 25, 2005 motion). At a March 25, 2005
9 hearing, the bankruptcy court stated it would grant Excel's motion, which it did in a written order
10 dated June 2, 2005. *Id.*, ¶¶ 6, 8.

11 In the meantime, on May 5, 2005, Defendants brought another motion seeking relief from the
12 automatic stay. *Id.*, Ex. D. The May 5, 2005 request is more limited than the earlier October 20,
13 2004 motion in that it requests relief from the stay only to pursue this sanctions motion. *Id.*
14 Defendants asserted that they should be permitted to proceed with the sanctions motion because it
15 would be unfair to allow the case to proceed on the ownership issue while depriving Defendants the
16 opportunity to defend themselves with the sanctions motion. *Id.* at 6-9. In support of this
17 contention, Defendants cited *In re Merrick*, 175 B.R. 333, 334 (9th Cir. BAP 1994). *Id.* at 7. The
18 bankruptcy judge denied that request, however, in an order dated June 21, 2005. *Id.*, ¶ 7. According
19 to the Ninth Circuit Bankruptcy Appellate Panel, the bankruptcy judge denied the May 5, 2005
20 request without prejudice on the basis that at that time, Excel did not have counsel who could defend
21 the motion. Defendants' Request for Judicial Notice, Ex. E (May 2, 2006 decision of Bankruptcy
22 Appellate Panel) at 3. Defendants appealed that order and in an order dated May 2, 2006, the
23 Bankruptcy Appellate Panel held that the sanctions motion is "not subject to the automatic stay." *Id.*
24 Subsequently, in an order dated May 24, 2006, the Court permitted Defendants to renotice their
25 sanctions motion. Defendants' Request for Judicial Notice, Ex. F.

26

27

28 [3] The arbitration involved the alleged breach of a settlement agreement that followed Indivos' termination of Hoffman as president in 1999. Goodsell Decl., Ex. A

United States District Court
For the Northern District of California

**B.    Facts Regarding Patent Ownership[4]**

Hoffman is founder of Plaintiff Excel and was its president until December 2004, when he resigned. May 27, 2004 Summary Judgment Order at 5; Opposition of Ned Hoffman to Motion for Sanctions and Objection to Hearing and Determination by Magistrate Judge ("Hoffman Opposition") at 2. Excel was known previously as Omnilock, Inc. ("Omnilock") and Sports-Mitt, Inc. ("Sports-Mitt"). May 27, 2004 Summary Judgment Order at 5. Omnilock merged into Sports-Mitt on November 30, 1995 and Sports-Mitt changed its name to Excel on April 12, 1996. *Id.*

Hoffman entered into an employment agreement with Omnilock and Sports-Mitt in 1994. *Id.* at 6. In the same year, two other individuals, David Pare and Jonathan Lee, entered into consulting agreements with Omnilock. *Id.* All three were working on developing biometric products and patents using fingerprint recognition. *Id.* In early 1995, Hoffman, Pare and Lee agreed to form a new company that would own the biometric patents and develop and market products using that technology. *Id.* at 8. The three entered into a letter agreement to this effect on March 30, 1995, with Hoffman acting on behalf of Omnilock in his capacity as president. *Id.* at 8-9. On May 8, 1995, the Articles of Organization for the new entity, called SmartTouch LLC, were filed with the California Secretary of State. *Id.* at 9. Attached to the Articles of Organization was an Operating Agreement, dated "as of May 16, 1995." *Id.* This Operating Agreement was amended on June 16, 1995, and again on June 30, 1995. *Id.* at 18-19. In the May 27, 2004 Summary Judgment Order, the Court concluded that under the June 16, 1995 Operating Agreement, as amended, Omnilock conveyed to SmartTouch LLC all the rights to the technology covered by the patents at issue in the case. *Id.* at 46.

Hoffman and Excel, however, assert that Omnilock and SmartTouch LLC entered into an IP-Patent License dated May 8, 1995 that gave SmartTouch LLC only a conditional sublicense to the technology covered under the patents. *Id.* at 10. The IP-Patent License states that Omnilock conditionally assigned the patents to SmartTouch LLC so long as SmartTouch met certain

---

[4] The Court's May 27, 2004 Summary Judgment Order sets forth in detail the facts relating to the various entities and individuals relevant to the underlying claims. Accordingly, the Court provides only a brief summary of this background information here.

1  performance requirements, including a requirement that SmartTouch LLC pay Omnilock $20 million
2  within six years of the effective date of the agreement. *Id.* at 10-11. Failure to meet these
3  requirements would result in termination of the agreement and all assignments of the patents would
4  be rescinded. *Id.* at 10. The IP-Patent License was signed by "Ned Hoffman, President" on behalf of
5  Omnilock and "Ned Hoffman, Manager," on behalf of SmartTouch LLC. *Id.* at 11. The agreement
6  was negotiated by attorney Thomas A. Maier on behalf of Omnilock/Excel, and attorney Ali
7  Kamerei on behalf of SmartTouch LLC. *Id.*

8  In 1997, SmartTouch LLC incorporated as SmartTouch, Inc. *Id.* at 5. In 2000, SmartTouch,
9  Inc. was renamed Veristar. In 2001, Veristar was renamed Indivos. *Id.* By late 2002, Indivos was
10 experiencing severe financial difficulties and was looking for a merger partner. *Id.* at 31. Solidus
11 made a merger proposal to Indivos' CEO at that time, Robert Goldberg. *Id.* According to Goldberg,
12 Hoffman was initially very supportive of the merger but later opposed it "aggressively" and filed
13 numerous lawsuits, including this action, in an unsuccessful effort to prevent it from occurring. *Id.*
14 Hoffman did not obtain permission to file this action from the other two members of the Excel Board
15 of Directors, Harold Silen and David Mendelsohn. *Id.* at 32, n. 8. Rather, Silens and Mendelsohn
16 asked that the action be dismissed because it was based on false premises. *Id.* When Hoffman
17 refused to do so, Silens and Mendelsohn resigned from the Board of Directors. *Id.* In notes of a
18 meeting of the Excel Board of Directors that occurred on March 10, 2003, Hoffman is quoted as
19 saying that he didn't "give a damn" what the Board of Directors thought about the lawsuit.
20 Declaration of Kristen A. Palumbo in Support of Motion for Sanctions Against Excel Innovations,
21 Inc. and Ned Hoffman ("Palumbo Decl."), Ex. 3 at HS02711.

22  **C.    The Other Litigation**

23 Between November 2002 and July 2003, Hoffman and/or Excel filed eleven actions in state
24 court relating to the merger between Indivos and Solidos. *See* Palumbo Decl., Ex. 12 (chart of
25 lawsuits). In addition, Ali Kemerei filed four shareholder actions against Indivos, and Betsy
26 Ehrenberg, who Hoffman describes as a "business partner" and "friend" and who was a large
27 investor in Excel, filed one action against Indivos. *Id.*; *see also*, Palumbo Decl., Ex. 16 at 364. In a
28 number of these actions, the plaintiffs challenge the Solidus merger on the basis that Solidus was

6

1  trying to "steal" Indivos' "extremely valuable intellectual property." *See, e.g.*, Defendants' Request
2  for Judicial Notice, Ex. S, ¶ 10. All of these cases were dismissed, one on the merits. Palumbo
3  Decl., Ex. 12.

### D.  The Motion

5  Defendants assert that Excel and Hoffman have engaged in rampant and "appalling"
6  misconduct throughout the discovery process, including intentional concealment of evidence,
7  production of a "phony computer," fabrication of evidence, and assertion of privilege solely to delay
8  production of documents. According to Defendants, this conduct is so pervasive that "[n]othing
9  Excel and Hoffman say in this case, and no evidence they produce, should be trusted." Reply at 2.
10  As such, they argue, the misconduct threatens to interfere with the rightful decision of the case and
11  the only appropriate sanction is dismissal of Excel's claims and counterclaims.[5]

12  Excel and Hoffman assert, as a preliminary matter, that the Motion cannot be heard by the
13  undersigned because the district court judge referred only discovery to the undersigned and the
14  Motion is not a discovery motion.[6] Excel and Hoffman go on to argue that terminating sanctions are
15  not warranted for a number of reasons. First, they assert that Defendants have waited too long to
16  bring the Motion and that they did not meet and confer prior to bringing the Motion, as required by
17  Rule 37 of the Federal Rules of Civil Procedure. Second, they argue that much of the conduct which
18  forms the basis for Defendants' motion is by Hoffman, who is merely a witness and whose actions
19  cannot be attributed to Excel. Third, Excel and Hoffman assert that the motion is moot, at least as to
20  the ownership issue, because Defendants already prevailed on that issue on summary judgment.
21  Fourth, they argue that sanctions cannot be entered as to the non-ownership claims, because
22  sanctions must be related to the specific claims to which the alleged misconduct relates. Fifth, Excel

[5] On October 16, 2006, after the Motion was fully briefed, the Court granted Excel's unopposed motion to dismiss with prejudice all of the counterclaims if asserted against Defendants as well as the breach of contract claim asserted in its First Amended Complaint. Thus, the only claims that remain in the case on the part of Excel are the patent infringement claims asserted in the First Amended Complaint.

[6] This argument was rendered moot by the Court's October 23, 2006 Order referring the Motion to the undersigned magistrate judge for a report and recommendation.

United States District Court
For the Northern District of California

1 and Hoffman assert that the bankruptcy stay allows Defendants to use their motion only defensively
2 and any ruling on the sanctions motion will necessarily have implications for Defendants'
3 counterclaims, thus violating the bankruptcy stay. Sixth, Excel and Hoffman assert that the motion
4 should not be granted because Defendants have established no prejudice as a result of the alleged
5 misconduct. Finally, Excel and Hoffman assert that they have engaged in no misconduct.

### E. The Alleged Misconduct

7 In the Motion, Defendants present evidence they assert shows that Hoffman and Excel
8 wilfully destroyed and/or concealed documents, that they produced a computer that purportedly had
9 been used as Excel's office computer but which in fact, hadn't been turned on since 1996, and that
10 Hoffman lied repeatedly to cover up his and Excel's wrongful acts. According to Defendants, a
11 number of significant documents in the case were only produced *after* Excel and Hoffman learned of
12 their existence from other sources. They assert that some documents produced by Defendants were
13 intentionally altered. They also argue that Excel and Hoffman intentionally withheld documents
14 regarding the formation of SmartTouch LLC and the March 2003 Board Minutes for Excel, relying
15 on a groundless assertion of privilege. The alleged misconduct is summarized below.

#### 1. The Allegedly "Phony" Computer and Hoffman's Subsequent Explanations Regarding His Use of the Computer

18 When he was deposed in October 2003, Hoffman produced what Defendants characterized as
19 an "exceedingly small" number of documents. Palumbo Decl., Ex. 19 (December 19, 2003 letter
20 from Defendants' counsel to Excel's counsel). When questioned, Hoffman testified that he didn't
21 "recall any specific steps" he had taken to preserve electronic documents since November 2002,
22 when the first lawsuit was filed. Palumbo Decl., Ex. 1 (Hoffman Depo.) at 263. Hoffman further
23 testified that he had a "work computer" in San Jose ("the San Jose Laptop"), *id*. at 253-254, but he
24 did not know "as a rule" whether he retained e-mails. *Id* at 259. When asked whether he had deleted
25 any documents that "may have had a bearing on this litigation," Hoffman answered that he did "not
26 recall." *Id*. at 263.

27 Defendants were dissatisfied with Hoffman's responses and informed Excel's counsel in a
28 subsequent correspondence that "both Hoffman and Excel have failed to adequately search for and

United States District Court
For the Northern District of California

produce documents in response to our subpoenas." Palumbo Decl., Ex. 19 (December 19, 2003 letter from Defendants' counsel to Plaintiff's counsel). Soon thereafter, the parties agreed that the San Jose Laptop would be produced and inspected by an independent expert *agreed to by the parties*, David Klausner. *See* Declaration of David Klausner, ¶ 3. Klausner has over 35 years experience in the computer field, including "forensic investigation and reverse engineering." *Id.*, ¶ 2.

Klausner inspected the San Jose Laptop on December 30, 2003. *Id.*, ¶ 4. He concluded that the computer had not been turned on since August 24, 1996. *Id.*, ¶ 11. In a deposition on February 5, 2004, Hoffman was asked about his use of the San Jose Laptop and "why no files have been worked on since 1996." Klausner Decl., Ex. C (Hoffman Depo.) at 43. He responded that he only used the laptop for word processing – that is, he composes documents, prints them, and exits without saving. *Id.* at 44. He testified that this had been his practice for the entire time he owned the computer, which was "about one and a half years" and that he had "never" saved a document. *Id.* According to Klausner, however, the San Jose Laptop could not have been used in this way, because even if Hoffman did not save documents, other "files or recordations," including "GRP files," would have been found on the hard drive that were dated after August 24, 1996, and Klausner found nothing of this sort on the computer. Klausner Decl., ¶¶ 10-11.

Excel, however, retained an expert, Paul Mattal, who disagreed with Klausner. Declaration of Paul J. Mattal [in Support of] Opposition to Motion for Sanctions ("Mattal Decl."). Mattal was hired in May 2004 to inspect the San Jose Laptop. *Id.*, ¶ 3. Mattal states that he made a "sector-by-sector" image of the hard drive and then removed the hard drive to observe the state of the internal clock without affecting the hard drive. *Id.*, ¶ 8. Mattal discovered that the internal clock was not set. *Id.* He theorized that this occurred when the back-up battery ran out of power on August 24, 1996. *Id.* When power was restored, the internal clock defaulted to January 1980. *Id.*, ¶ 9. Mattal found 19 files with time stamps of 1980, which he concluded were created after August 24, 1996. *Id.*, ¶ 15.

Klausner, in his Reply Declaration, rejects Mattal's analysis. Reply Declaration of David Klausner ("Klausner Reply Decl."). He reiterates his belief that Hoffman could not have used the computer for word processing, explaining that if the internal clock failed in August 1996, any GRP files created when Hoffman booted the computer after that time would have carried the January 1980

9

1  timestamp under Mattal's theory. *Id.*, ¶ 5. Yet the GRP files carry 1996 time stamps. *Id.* Therefore,
2  Klausner concluded, Hoffman could not have used the laptop in the way he described. *Id.*

### 2.   Kinkos Dates

4   In the spring of 2004, Hoffman was asked in his arbitration deposition and later, at the
5  arbitration itself, whether the dates printed in footers on some of the e-mails that had been produced
6  – which were later than the dates on which the e-mails were sent – were the dates on which the e-
7  mails were printed off the computer (which would have established that the e-mails had been saved,
8  contrary to Hoffman's prior testimony). Palumbo Decl., Ex. 13 (Arbitration Depo.) at 75-79; Ex. 16
9  (Transcript of Arbitration Proceeding) at 375. Hoffman testified that these dates were not printed by
10  the computer but rather, were dates that he had Kinkos print on the documents when he made copies
11  of his printed e-mails to produce to counsel. *Id.*, Ex. 13 (Arbitration Depo.) at 77-79. Hoffman was
12  asked about several e-mails that carried a footer of April 27, 2003 and Bates Stamp numbers of
13  6393-6396. *Id.*, Ex. 16 at 377-378. In particular, he was asked to explain why he would have dated
14  these documents and provided these documents to counsel at that time when the federal case had not
15  yet been filed and no document production had occurred in the state cases. *Id.* Hoffman provided no
16  explanation as to these documents.

### 3.   Defendants' Evidence that Hoffman Saves Documents

18   Defendants point to various statements and testimony they assert shows that Hoffman was
19  lying when he said he only uses the computer for word processing to conceal documents from
20  Defendants. They note that Excel's counsel, in updating Defendants about the status of the
21  document production, stated that she had in her possession about a half dozen boxes of documents,
22  "including documents printed from Exel's [sic] computers. *Id.*, Ex. 22 (December 8, 2003 Letter) at
23  2. They also point to similarities between the 1995 IP-Patent License and a purported 2003 Sub-
24  License Agreement between Excel and Aviv. *See id.*, Ex. 27 (Excel-Aviv) Agreement & Ex. 28
25  (1995 IP-Patent License). These documents are virtually identical, containing even many of the
26  same typographical errors. *Id.* Defendants point out that the later agreement lists Pare and Lee as
27  Excel consultants and Thomas Maier as its legal counsel, even though none of these individuals were
28  employed by Excel in 2003. Excel and Hoffman, however, assert that Hoffman did not use the saved

**United States District Court**
For the Northern District of California

10

1 version of the earlier agreement as a template but rather, that Hoffman *retyped* the agreement,
2 incredibly, reproducing the exact same typographical errors. Finally, Defendants point to an e-mail
3 exchange between Hoffman and Betsy Ehrenberg on July 16, 2003, that included a copy of an e-mail
4 Hoffman had sent to former Excel Directors Silens and Mendelsohn in March of that year. *Id.*, Ex.
5 34. Although Hoffman testified in the arbitration that he sent the e-mail to Ehrenberg at the same
6 time he sent the e-mails to Silens and Mendelsohn, *id.*, Ex. 16 at 367, Ehrenberg testified that she
7 was "sure" he had sent it to her in July and that she wasn't even talking to Hoffman in March. *Id.*,
8 Ex. 17 at 1811.

9 **4. The Initial Production**

10 Defendants assert that Excel and Hoffman's initial production on October 31, 2003, of only
11 408 pages, was in bad faith. *See* Palumbo Decl., ¶ 20 (Excel produced 87 pages of documents and
12 Hoffman produced 321 pages of documents) & Ex. 21 (Subpoenas to Excel and Hoffman). They
13 assert that it was only because former directors Silens and Mendelsohn produced almost 10,000
14 pages of documents around the same time that Excel and Hoffman eventually produced over 10,000
15 pages of documents themselves. *See id.*, Ex. 5 (Letter dated November 6, 2003 pointing out that
16 while Excel and Hoffman had produced "virtually no documents in response to broad document
17 requests covering eight years," Mendelsohn and Silens had produced "many boxes of records").

18 **5. The March 30, 1995 Letter Agreement and May 17, 1995 Letter**

19 Defendants contend that Excel and Hoffman intentionally concealed two key documents
20 relating to ownership of the patents in dispute: the March 30, 1995 letter agreement between Pare,
21 Lee and Hoffman discussed above, and a May 17, 1995 letter from Thomas Maier. *See id.*, Ex. 35
22 (the March 30, 1995 letter agreement) & Ex. 36 (the May 17, 1995 letter). Both documents are
23 strong evidence that Omnilock (Excel's predecessor) consented to the assignment of the disputed
24 patents to SmartTouch LLC (Indivos' predecessor). These documents were particularly significant,
25 Defendants assert, because Excel's theory of ownership at that time was that Pare and Lee had
26 agreed to assign their patent rights to Excel under their consulting agreement and could not assign
27 those rights to SmartTouch LLC without Excel's consent. *See* Excel Summary Judgment Motion,
28 Docket No. 139 at 4-6. The documents were produced by Lee and Maier at their depositions,

11

1 pursuant to subpoenas to those individuals. Palumbo Decl., ¶¶ 34-35. They were never produced by
2 Excel or Hoffman or included on any privilege log.

3 **6. The Perel Documents**

4 Defendants assert that Hoffman, Excel, and Excel's former counsel of record in this case,
5 Jefferson Stamp, engaged in misconduct in connection with a sale of Indivos stock by Hoffman to a
6 neighbor, Geoffrey Perel. According to Perel, he agreed to purchase stock in Indivos from Hoffman
7 in October 2002. *Id.*, Ex. 37 (Perel Depo.) at 27. He testified that he was under the impression that
8 Indivos owned the patents at issue in this case. *Id.* at 28. Subsequently, Perel contacted Indivos'
9 former CEO and Chairman Robert Goldberg about the merger with Solidus, of which he had not
10 received notice. Defendant's Request For Judicial Notice, Ex. V (Declaration of Robert Goldberg in
11 Support of Motion for Expedited Discovery) at ¶ 2. As a result of this conversation, which occurred
12 on August 27, 2003, it was discovered that Perel's stock certificates were forged and Indivos had no
13 record of them. *Id.*, ¶ 4.

14 On August 30, 2003, Hoffman, wrote a letter to Perel offering him either Excel stock in the
15 same "equity percentages and capitalization proportions" as the Indivos stock or repurchase of the
16 stock for $10,000 with the requirement that Perel turn over the "original and all copies" of the stock
17 certificates and any Indivos materials Perel had received as part of the sale. *Id.*, Ex. 40 (Hoffman
18 Letter, turned over by Perel at his deposition). Two days later, Stamp sent Perel a letter saying he
19 would stop by Perel's attorneys' office to complete the "repurchase." Palumbo Decl., Ex. 42. Perel
20 opted for the $10,000 repurchase but did not agree to turn over the stock certificates, which he
21 subsequently produced at his deposition in this action. *See* Palumbo Decl., Ex. 40 (Settlement
22 Agreement). Excel did not turn over Stamp's letter until February 2004, after Defendants had
23 already learned of it from Perel.[7]

24 **7. Bartlett and Alt Sales**

25 Defendants point to documents relating to stock sales to Hoffman's hairdresser, Robert

26 

27 [7] Defendants first expressed concerns about the Perel transaction in their Motion for Expedited Discovery, filed September 22, 2003. In that Motion, Defendants asserted that Plaintiff's were "attempting to silence" Perel and were seeking to "acquire and destroy the phony stock certification."
28 Motion for Expedited Discovery at 2.

12

1 Bartlett, and another individual, Ted Alt, as further evidence that Hoffman concealed relevant
2 documents in the course of discovery. Defendants learned about the sale to Bartlett when Bartlett
3 called Indivos to inquire about statements Hoffman had made to him in the course of selling him
4 $20,000 worth of Excel stock. Palumbo Decl., ¶ 38. Defendants subsequently subpoenaed Bartlett,
5 who produced documents relating to the transaction, including an advertising brochure Hoffman had
6 given him about Excel. *Id.* & Ex. 45. After Defendants sent Excel a letter inquiring why no
7 documents regarding the Bartlett sale had been produced, Excel produced documents relating to the
8 sale. *Id.*, ¶ 38. Defendants also point to an e-mail from Edward Alt to Hoffman inquiring why he
9 had been sent $10,000 in share certificates for Excel when he had agreed to purchase $10,000 in
10 Indivos stock. *Id.*, Ex. 46. This document was never produced by Excel or Hoffman. *Id.*, ¶ 39.

### 8. The Ehrenberg Documents

12 Defendants point to testimony by Betsy Ehrenberg, as well as a Subscription Agreement, that
13 in February or March of 2003 she invested $50,000 in Excel at Hoffman's request. *Id.*, Ex. 17
14 (Transcript of Arbitration Proceeding) at 1673-1674 & Ex. 48 (Subscription Agreement). Ehrenberg
15 also produced a letter from Hoffman to Ehrenberg dated February 26, 2003, stating that all of her
16 Indivos stock would be protected and honored with Excel stock. *Id.*, Ex. 49. Hoffman and Excel did
17 not produce either of these documents.

### 9. The June 24, 2002 e-mail

19 Defendants point to a discrepancy between an e-mail produced by Excel and an e-mail
20 produced by former Indivos director Larry Ginsburg as evidence that Hoffman not only retains e-
21 mails but has also fabricated evidence by altering them and producing them in this case. *See*
22 Palumbo Decl., Ex. 50 (Excel version); Declaration of Larry P. Ginsburg in Support of Defendants'
23 Motion for Sanctions Against Excel Innovations, Inc. and Ned Hoffman ("Ginsburg Decl."), Ex. A
24 (Ginsburg version). The Ginsburg version and the Excel version contain identical text except that
25 the Excel version includes a section that was not in the Ginsburg version discussing the Perel stock
26 sale. Defendants assert that this was an attempt by Hoffman to create the impression that Indivos
27 knew of the Perel stock sale and must have approved it. In his declaration, however, Ginsburg states

13

1  that he has never heard of Perel and never had any discussions with Hoffman or anyone else about a
2  sale of Indivos stock to Perel.

3                              **10.    The October 25, 2002 e-mail**

4          Defendants also point to another e-mail produced by Hoffman and Excel that they assert was
5  falsified, dated October 25,2002. *See* Declaration of Robert Goldberg in Support of Defendants'
6  Motion for Sanctions Against Excel Innovations', Inc. and Ned Hoffman ("Goldberg Decl."), Ex. A
7  (e-mail Defendants assert is true version and which Goldberg says he received) & Ex. B (e-mail
8  Defendants assert is fabricated and which Goldberg says he did not receive). The two e-mails are
9  identical except that in the one that Goldberg says he did receive, the e-mail refers to a contingency
10 plan in which all patent rights revert to the inventors, while the e-mail Goldberg says he did not
11 receive – and which Hoffman and Excel produced in this case – refers to a contingency plan in
12 which all rights would revert to *Excel*. The latter version also differs from the version Goldberg says
13 he received in that it lists different recipients and begins with the words "Original Message" at the
14 top, suggesting that Hoffman may have forwarded the message to himself in order to alter the text.
15 *Id.*, Ex. B. Defendants assert that Hoffman altered the e-mail to support his position that at the time
16 the e-mail was sent he believed Excel was entitled to pull back the patent rights under the 1995 IP-
17 Patent License. When asked about the discrepancies between the two versions, and in particular,
18 why the version he had produced carried the "Original Message" header, Hoffman was unable to
19 provide any explanation. *See* Palumbo Decl., Ex. 16 (Hoffman Arbitration Deposition) at 181-185.

20

21                **11.    Withholding of Corporate Formation Documents and March 23, 2003
                           Meeting Minutes**

22         Defendants assert that Hoffman and Excel "interposed absurd claims of privilege" to delay
23 production of documents. For example, they point to the May 12, 1995 Draft Operating Agreement,
24 which was not produced until April 6, 2004 by Maier at his deposition, even though the document
25 was requested in December 2003, after months of withholding it as privileged. Palumbo Decl., ¶ 48.
26 They also point to Excel's refusal to produce documents relating to Indivos' formation if they
27 predate May 5, 1995. *See* Palumbo Decl., ¶ 47 & Ex. 55 (Excel letters re production). Finally,
28 Defendants point to the March 2003 Excel Board Meeting Minutes, which Excel did not produce

United States District Court
For the Northern District of California

14

1  until April 12, 2004, although Defendants were aware of the existence of the minutes and repeatedly

2  requested their production between October 2003 and April 2004. Palumbo Decl., ¶¶ 5- 9 & Ex. 7.

3  **IV.    ANALYSIS**

4  ### A.    Whether Motion May be Heard by a Magistrate Judge

5  Excel and Hoffman objected that the Motion could not be heard by the undersigned

6  magistrate judge because the Motion is outside of the scope of the district court's discovery referral.

7  Subsequently, however, the district court judge issued an order specifically referring the Motion to

8  the undersigned magistrate judge. In light of this referral, it is clear that the Motion can be heard by

9  Magistrate Judge Spero for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See N.*

10  *Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447 1450 (9th Cir. 1986) (affirming

11  dismissal of claims as discovery sanction where district court judge had conducted de novo review of

12  magistrate judge's report and recommendation by reviewing the record developed by the magistrate

13  judge and holding that de novo review did not require district court judge to actually conduct a new

14  hearing); *Cabinetware Inc. v. Sullivan*, 1991 WL 327959 (E.D. Cal.) (magistrate judge makes

15  findings and recommendations to district court judge regarding motion for terminating sanctions

16  based on discovery misconduct).

17  ### B.    Timeliness of Motion

18  Excel and Hoffman assert that the Motion should be denied on the basis that it is untimely

19  under Civil Local Rule 7-8(c), which requires that a sanctions motion be made "as soon as

20  practicable after the filing party learns of the circumstances that it alleges make the motion

21  appropriate." Excel and Hoffman argue that by filing their initial terminating sanctions motion *after*

22  they had already filed their motion for summary judgment, Defendants waived their right to proceed

23  with the sanctions motion under the theory of election of remedies. Excel and Hoffman further

24  assert that Defendants unreasonably delayed after Excel and Hoffman initiated their bankruptcy

25  proceedings by waiting for almost a year to seek relief from the stay. Finally, Excel and Hoffman

26  assert that Defendants acted unreasonably in waiting to obtain permission from the bankruptcy court

27  to file the sanctions motion, given that the Bankruptcy Appellate Panel concluded that the automatic

28  stay never prevented Defendants from asserting a defensive sanctions motion. The Court rejects

**United States District Court**
For the Northern District of California

1 these arguments and finds that the Motion is timely.

2      First, the assertion that by filing a motion for partial summary judgment before filing their
3 sanctions motion Defendants waived any right to proceed on the latter under the theory of election of
4 remedies is not persuasive. The election of remedies doctrine "prevents a party from obtaining
5 double redress for a single wrong." *Latman v. Burdette*, 366 F.3d 774, 782 (9th Cir. 2004). In order
6 for an election of remedies to be binding, three requirements must be met: "1) two or more remedies
7 must have existed at the time of the election, 2) these remedies must be repugnant and inconsistent
8 with each other, and 3) the party to be bound must have affirmatively chosen, or elected, between the
9 available remedies." *Id.*

10      Here, Defendants filed the sanctions motion before the hearing on the summary judgment
11 motion and the arguments in both motions are consistent. In particular, Defendants argued in the
12 summary judgment motion that even though Hoffman had lied "repeatedly" in his deposition and his
13 position as to ownership was a "fantasy," there was, nonetheless, enough authentic evidence to
14 establish that Defendants owned the patents. [Docket No.179 at 7]  The Court, fully aware of
15 Defendants' assertions of misconduct in the sanctions motion, based its summary judgment decision
16 on its interpretation of the June 16, 1995 Operating Agreement without addressing the authenticity of
17 the IP-Patent License or the alleged misconduct. Under these circumstances, the Court concludes
18 that the sanctions motion and the summary judgment motion do not address a "single wrong," the
19 remedies are not inconsistent, and Defendants did not affirmatively elect between the remedies.

20      The case on which Excel and Hoffman rely, *United States Fid. & Guar. Co. v. Baker*
21 *Material Handling Corp.*, 62 F.3d 24 (1st Cir. 1995), does not support their position. In that case,
22 the plaintiffs were aware of the allegedly inaccurate discovery responses before trial but elected to go
23 to trial without raising the issue. *Id.* at 29. Only after the plaintiffs failed at trial did they request
24 discovery sanctions. *Id.* As noted above, in this case, Defendants brought their sanctions motion
25 before the Court had ruled on or heard the summary judgment motions. Further, in contrast to the
26 plaintiffs in *United States Fid. & Guar. Co. v. Baker Material Handling Corp.*, Defendants did not
27 fail on summary judgment but rather, were successful.

28      The Court also rejects the assertion that the Motion was untimely because Defendants could

16

1  have filed it at any time after the bankruptcy proceedings were initiated and further, they delayed in
2  seeking relief from the stay. With respect to the former point, it was entirely reasonable of
3  Defendants to seek leave of the bankruptcy court to proceed with the sanctions motion in light of this
4  Court's June 23, 2004 Order denying the original sanctions motion without prejudice based on the
5  bankruptcy stay. The Court also notes that Defendants did not delay seeking relief from the stay for
6  almost a year, as Plaintiff's assert. Rather, within four months, in October 2004, Defendants had
7  requested complete relief from the stay in the bankruptcy court. Therefore, the Court concludes that
8  the requirements of Local Rule 7-8(c) have been met.

### C. Meet and Confer Requirement

Excel and Hoffman assert that the Motion should be denied because Defendants did not meet and confer prior to bringing the Motion, as required pursuant to Rule 37 of the Federal Rules of Civil Procedure. The Court disagrees. The Motion was not brought under Rule 37 and therefore, the meet and confer requirement in that rule does not apply. Further, in light of the serious misconduct alleged and Hoffman and Excel's denial that any misconduct occurred, efforts to meet and confer would likely have been futile.

### D. Whether Motion is Moot

Excel and Hoffman assert that the Motion is moot as to Defendants' request for dismissal of the claims that depend on ownership of the patents because Defendants have already prevailed on summary judgment on that issue. In the cases on which Excel and Hoffman rely, courts found that sanctions motions were moot because they had already granted summary judgment and dismissed *all of the claims in the case. See, e.g., United States v. $1,790,021 in U.S. Currency*, 261 F. Supp. 2d 310, 318-319 (M.D. Pa. 2003); *Werner v. Pittway Corp.*, 90 F. Supp. 2d 1018, 1034 (W.D. Wis. 2000); *Snyder v. Liberty Mut. Ins. Co.*, 686 F.Supp. 525, 526 n. 2 (E.D. Pa. 1988). Here, in contrast, Excel's patent infringement claims have not been dismissed, even though the Court has resolved the issue of ownership. Thus, the Motion is not moot.

### E. Whether the Motion is Inherently Offensive and Thus Prohibited Under Stay

Excel further asserts the Motion violates the stay because it is not purely defensive and therefore should be denied. Specifically, Excel asserts that Defendants will, if they prevail, be able

17

1  to use findings the Court may make on this Motion offensively to support their counterclaims against
2  Excel.[8]  The Court disagrees.

3        Pursuant to 11 U.S.C. § 362(a)(1), initiation of a bankruptcy proceeding under Chapter 11
4  stays "the commencement or continuation . . .of a judicial . . . action or proceeding against the debtor
5  that was or could have been commenced before the commencement of the case under this title . . . ."
6  The Ninth Circuit has made clear that this provision does not apply to actions by the *debtor* to
7  prosecute claims. *See In re Merrick*, 175 BR 333, 338 (9th Cir. BAP 1994).  Further, equitable
8  principals require that where a debtor is permitted to prosecute claims, the stay also does not prevent
9  a defendant who is being sued by a debtor to defend against those claims. *Id.*

10       In this case, the Bankruptcy Appellate Panel has expressly held that Defendants' sanctions
11  motion is defensive and therefore, is not prohibited under the stay.  Because this question has already
12  been resolved, it is the law of the case and therefore binding on this court. *See Celotex Corp. v.*
13  *Edwards*, 514 U.S. 300, 313 (1995).

14       Even assuming the Court were not bound by the decision of the Bankruptcy Appellate Panel,
15  Excel's assertion that the Motion is, by its nature, both defensive and offensive, is not convincing.
16  While Excel asserts generally that Defendants will be able to use findings on this motion in support
17  of their counterclaims against Excel, the only specific issue it identifies that may overlap is the
18  question of whether Hoffman is Excel's alter ego.  Yet Defendants in their Reply abandoned their
19  reliance on an alter ego theory as a basis for attributing Hoffman's conduct to Excel and the Court
20  does not rely on that theory in support of its ruling.  Therefore, the Court concludes that the sanctions
21  motion is defensive only.

22   **F.   Whether Hoffman's Conduct Can be Imputed to Excel**

23       Excel asserts that the Court may not attribute Hoffman's conduct to Excel for the purposes of
24  the Motion, dismissing Defendants' assertion of alter ego liability as "baseless" and arguing further
25  that Hoffman was subpoenaed and deposed in his individual capacity and therefore, Excel cannot be

27  [8] The Court notes that it need not consider the possibility that its ruling on the Motion could be
28  used offensively against Hoffman only, because Hoffman's bankruptcy proceeding was dismissed and therefore, the stay does not apply as to Hoffman.

United States District Court
For the Northern District of California

1  held responsible under a theory of respondeat superior. Without reaching the question of alter ego

2  liability,[9] the Court concludes that the misconduct at issue in this Motion is attributable to both

3  Hoffman and Excel.

4  The parties appear to agree that the applicable rule for determining whether Excel can be held

5  liable for Hoffman's acts is as follows:

6  [A] corporation can act only through its agents and employees, and . . .
   no reasonable distinction can be made between the guilt of the
7  employee in a managerial capacity acting within the scope of his
   employment and the guilt of the corporation.

8

9  *Prospectus Alpha Navigation Co., Ltd. v. N. Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1386 (9th

10  Cir. 1985) (cited by Defendants in Reply at 7); *see also Persson v. Smart Inventions, Inc.*, 125 Cal.

11  App. 4th 1141, 1167 (2005) (cited by Excel and Hoffman in Sur-reply at 7 and applying the rule that

12  "a corporation can only act through its officers and employees. Any act or omission of an officer or

13  employee within the scope of authority or employment is, in law, the act of such corporation").

14  Excel does not dispute Hoffman was, at the time of the conduct on which the Motion is

15  based, Excel's CEO, President, Director, majority shareholder and *sole* employee. Further, much of

16  the alleged discovery misconduct related to documents that were produced on behalf of Excel. As

17  such, Hoffman's acts and omissions relating to Excel's discovery obligations are attributable to

18  Excel.

19  **G.     Whether Terminating Sanctions Should be Imposed**

20  **1.     Legal Standard**

21  Courts have "inherent power to dismiss an action when a party has willfully deceived the

22  court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v.*

23  *R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983) (citing *Phoceene Sous-Marine, S.A., v.*

24  *U.S. Phosmarine, Inc.*, 682 F.2d 802, 806 (9th Cir. 1982)). Dismissal is only permitted, however,

25  when there is "willfulness, bad faith, or fault of the party." *Id.* Further, misconduct that is the basis

26

27  [9] Defendants note that in the arbitration, Hoffman was found to be Excel's alter ego, at least with
    respect to the filing of some of the state court lawsuits and this lawsuit. However, Defendants have not
28  cited any authority that the finding of the arbitrator is binding here. Nor have Defendants sought to
    establish that the requirements for alter ego liability are met on this Motion.

United States District Court
For the Northern District of California

for dismissal sanctions must be proven by clear and convincing evidence. *Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469 (D.C. Cir. 1995). In exercising its inherent powers, a court must comply with the requirements of due process. *Id.* In order to meet these requirements, dismissal is a permissible sanction "only when the deception relates to the matters in controversy, and because dismissal is so harsh a penalty, it should be imposed only in extreme circumstances." *Id.*

In determining whether dismissal is an appropriate sanction, the court weighs the following factors:

> 1) the public's interest in expeditious resolution of litigation; 2) the court's needs to manage its dockets; 3) the risk of prejudice to the party seeking sanctions; 4) the public policy concerning disposition of cases on their merits; and 5) the availability of less drastic sanctions.

*Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995) (citations omitted). Generally, the first two factors support dismissal sanctions while the fourth factor does not. *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990). Thus, the most important factors to be considered are the risk of prejudice to the party seeking sanctions and the availability of less drastic sanctions. *Id.* In *Anheuser-Busch*, the court held that terminating sanctions were warranted where the defendant had engaged in a "pattern of deception and discovery abuse" and where the court anticipated "continued deceptive misconduct." 69 F.3d at 352. Under these circumstances, the court held that it was "impossible . . . to conduct another trial with any reasonable assurance that the truth would be available." *Id.*

## 2. Findings of Fact

The Court makes the following factual and credibility findings:

a. Hoffman and Excel intentionally concealed many documents relevant to this action and responsive to Defendants' requests for documents.

b. Hoffman falsely testified that he did not save electronic documents. To the contrary, Excel produced e-mails that contained footers dated later than the dates of the e-mails. Similarly, Excel produced an e-mail exchange between Hoffman and Ehrenberg that includes a copy of an e-

20

1 mail sent several months earlier by Hoffman to Silens and Mendelsohn. Hoffman obviously used an
2 electronic copy of the 1995 IP-Patent License as a template for the 2003 Excel-Aviv Agreement.

3      c.    Hoffman falsely testified that the footer dates on the e-mails produced by Excel were
4 added by Kinkos or some other copy service.

5      d.    Excel and Hoffman forged and sold Indivos stock certificates, and intentionally and
6 wilfully sought to prevent Defendants from obtaining the forged stock certificates sold to Perel by
7 attempting to buy back all copies of these documents.

8      e.    Excel and Hoffman intentionally altered and produced as genuine the June 24, 2002
9 e-mail to Ginsberg and the October 25, 2002 e-mail to Goldberg to support their version of events.

10      f.    Hoffman testified falsely about the San Jose Laptop. Contrary to his testimony, the
11 San Jose Laptop: (1) was not used in the one and one-half years before his testimony; 2) had not
12 been used since 1996; and 3) had not been used by Hoffman to produce business documents without
13 saving those documents. The San Jose Laptop was produced by Excel and Hoffman to cover up
14 their failure to produce responsive documents.

### 3. Willfulness, Bad Faith, or Fault

16     Based on the factual findings listed above, the Court concludes that Excel and Hoffman have
17 engaged in intentional misconduct. They concealed (or attempted to conceal) documents. They lied
18 to cover up their misconduct. They intentionally fabricated evidence. They turned over a computer
19 which Hoffman represented was his work computer – which it was not – and lied about how the
20 computer was used. The Court concludes that Excel and Hoffman have acted willfully and in bad
21 faith.

### 4. Due Process

23     Excel and Hoffman argue that the Court may not consider the Perel incident because "it has
24 nothing to with this litigation" and therefore, imposition of sanctions based on that incident would
25 violate due process. Further, Excel and Hoffman assert that the alleged conduct is only relevant to
26 the ownership issue and not Excel's other "non-ownership" claims and counterclaims and therefore,
27 dismissal of those claims would violate due process. The Court need not address the latter
28 contention as Excel has now dismissed all of its claims but the infringement claims, which turn on

21

1  the question of ownership. The Court rejects Excel and Hoffman's position as to the Perel
2  documents. Clearly, the representations Hoffman made to Perel regarding Indivos as well as the
3  fabricated Indivos stock certificates are potentially relevant to the question of ownership. In any
4  event, the misconduct at issue here goes far beyond Excel and Hoffman's efforts to conceal the Perel
5  documents. Even if the Court were to disregard the Perel transaction, the evidence relating to Excel
6  and Hoffman's other misconduct would be sufficient to warrant imposition of terminating sanctions.

7              **5.      Availability of Less Drastic Alternatives**

8          Possible alternatives to terminating sanctions that are less drastic are monetary sanctions and
9  evidentiary sanctions. Here, the parties agree that monetary sanctions are not permitted under the
10  automatic stay. Further, it is not sufficient to simply preclude evidence at trial because this case
11  involves such a pervasive pattern of deceit, concealment and fabrication that the Court can have no
12  confidence in the ability of the judicial system to find the truth. The Court is particularly concerned
13  that because of the serious questions that remain about the reliability of – and possible gaps in – the
14  record, any future proceedings on the question of ownership will themselves be unreliable.
15  Therefore, the Court concludes that nothing less than terminating sanctions is appropriate. Further,
16  only terminating sanctions will adequately serve the purposes of punishing Excel and Hoffman and
17  deterring comparable conduct by others. *Id.*

18              **6.      Prejudice**

19          Excel and Hoffman assert that sanctions should not be imposed because Defendants have not
20  established that their conduct prejudiced Defendants in any way. The Court disagrees.

21          The Ninth Circuit has held that terminating sanctions are appropriate where a party's
22  misconduct "threaten[s] to interfere with the rightful decision of the case." *Anheuser-Busch,* 69 F.3d
23  at 354. That standard is met here. Because Excel and Hoffman's lies and concealment have been so
24  pervasive, there is no way for the Court to know what documents continue to be concealed and what
25  documents may be fabricated. Similarly, Hoffman has repeatedly lied in depositions, making his
26  testimony unreliable. Under these circumstances, Defendants will be severely prejudiced if they are
27  required to litigate on the merits as to the infringement claims that remain in the case.

28

**United States District Court**
For the Northern District of California

22

1  **IV.    CONCLUSION**

2          For the reasons stated above, it is recommended that the Motion be GRANTED and that

3  Excel and Hoffman's remaining claims against Defendants be dismissed with prejudice.

4

5  Dated: November 21, 2006

6

7                                                    JOSEPH C. SPERO
                                                     United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

EXCEL INNOVATIONS, INC.,                    Case Number: CV03-03125 MMC

       Plaintiff,                          **CERTIFICATE OF SERVICE**

v.

INDIVOS CORPORATION, ET AL.,

       Defendant.
_____/

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 21, 2006, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Alfred C. Pfeiffer
McCutchen Doyle Brown & Enersen, LLP
Three Embarcadero Center
San Francisco, CA 94111-4067

Bree Hann Morgan
Bingham McCutchen
3 Embarcadero Center
San Francisco, CA 94111

Ian Rose
2077 Mill Road
Novato, CA 94947

Irfan A. Lateef
Knobbe Martens Olson & Bear LLP
2040 Main Street
14th Floor
Irvine, CA 92614

John D. Pernick
Bingham McCutchen, LLP
Three Embarcadero Center, 18th Floor
San Francisco, CA 94111

John Thomas Hansen
Nossaman, Guthner, Knox and Elliott LLP
50 California St., 34th Floor
San Francisco, CA 94111

Jonathan E. Sommer
Stein & Lubin LLP
600 Montgomery Street, 14th Floor
San Francisco, CA 94111

Jonathan Herschel Bornstein
Law Offices of Bornstein & Bornstein
507 Polk Street
Suite 320
San Francisco, CA 94102-3339

Kristen A. Palumbo
Bingham McCutchen LLP
Three Embarcadero Center, Suite 1800
San Francisco, CA 94111

Mark Kenneth Slater
Bingham McCutchen LLP
3 Embarcadero Center
San Francisco, CA 94111-4067

Michael J.M. Brook
Lanahan & Reilley LLP
600 Bicentennial Way
Suite 300
Santa Rosa, CA 95403

Patricia Hughes
Lanahan & Reilley LLP
Attorney at Law
One Market Street
Steuart Street Tower, Ninth Floor
San Francisco, CA 94105

Steven L. Zelinger
Solidus Networks, Inc.
One Market
Spear Tower, Suite 700
San Francisco, CA 94105

Thomas Frank Smegal
Knobbe Martens Olson & Bear LLP
One Sansome Street, Suite 3500
San Francisco, CA 94114

Vernon C. Grigg
Law Office of Vernon C. Grigg III
601 Montgomery Street
Suite 325
San Francisco, CA 94111

Dated: November 21, 2006

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk

2